IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| THOMAS JOHN SLEVIRA, JR., | CV 24-166-BLG-DLC |
| Plaintiff, | |
| vs. | ORDER |
| BILLINGS POLICE DEPT., et al., | |
| Defendants. | |

Defendants have moved for summary judgment in two motions, one by the Officer Defendants, Jayden Romero and Brett Hilde, and one by the City of Billings. (Docs. 29 and 34.) Plaintiff Thomas John Slevira, Jr., has responded, and both motions are fully briefed. The motions are granted.

## I.  FACTUAL BACKGROUND

There are few undisputed facts in this matter. Throughout this order, the facts are drawn from both Defendants' Statements of Undisputed Facts ("SUF"), as well as supporting documents, and from Slevira's Statement of Disputed Facts ("SDF"). (Docs. 31, 32, 36, 40, and 42.) Slevira also filed declarations and various documents with his response briefs. (Docs. 39 and 41.)  The following summary background is undisputed and gives context to the discussion below. Further discussion of relevant facts will follow.

On January 8, 2023, Plaintiff Thomas Slevira, Jr., shot and killed a man and stole his vehicle. He drove a short distance and crashed. Slevira abandoned the crashed vehicle and burst into a nearby home, where people were gathered for a child's birthday party. Slevira shot one of the occupants of the house.[1] He entered the basement of the house, where he remained for hours. The occupants of the house fled. The Billings Police Department SWAT team responded to the house.

After several hours without Slevira exiting the house, the police shot gas cannisters into the basement. Slevira came out, climbing the stairs to where officers were waiting for him at the top, including the named defendants Officers Jayden Romero and Brett Hilde, and a third officer, Officer Wallis, who was also at the scene and is named as a "Respondent" in Slevira's Amended Complaint. (Doc. 11.)[2]

---

[1] Slevira was convicted of deliberate homicide, aggravated assault, assault with a weapon, and criminal endangerment, related to his actions prior to his arrest. (Doc. 36-4.)

[2] Wallis was named in the caption of the Amended Complaint, but the Amended Complaint did not include any specific allegations regarding his conduct. The Amended Complaint does not appear to have been served on Wallis, and Defendants' counsel did not answer on his behalf. Nor did Slevira seek service on Wallis or move for default, which, given the lack of allegations against him, likely would have been contested. In any event, this Order will address Wallis' participation as though he had been served, as, in the end, the result of the Court's analysis applies to Wallis as much as to the other named individuals.

After Slevira arrived at the top of the stairs, Hilde did a leg sweep that put Slevira on the floor. A struggle ensued, in which Romero, Wallis, and Hilde all hit Slevira. Hilde struck Slevira in the face or head with a closed fist. Wallis hit him several times with his elbow. Romero struck him with the muzzle of a shot gun that was loaded with beanbags. Slevira was cuffed and taken to the hospital. There, he was determined to have various bruises, a broken rib, and a pneumothorax. The crux of this case is whether the force used by the officers in this altercation was excessive.

## II. ANALYSIS

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Disputed facts that do not change the Court's analysis under the law may be disregarded.

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

**B. Officer Defendants' Motion**

The Officer Defendants move for summary judgment on three grounds: Slevira's claim for an Eighth Amendment violation fails as a matter of law, because he was not convicted at the time of the altercation; the Officers' use of force was objectively reasonable under the applicable Fourth Amendment standard; and the Officers are entitled to qualified immunity in any event. (Doc. 30 at 4 – 15.)

**1. Eighth Amendment**

Slevira's Amended Complaint alleges a violation of his Eighth Amendment rights to protection from cruel and unusual punishment and excessive force. (Doc.

4

11 at 3.) As the Officer Defendants point out, the Eighth Amendment protects a convicted person from cruel and unusual punishment; an arrestee's right not to be subject to excessive force arises under the Fourth Amendment. *Whitley v. Albers*, 475 U.S. 312, 318 (1986); *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). As a matter of law, Slevira cannot state a claim for a violation of the Eighth Amendment, because he was not a convicted person at the time of the subject events. Thus, Defendants are entitled to summary judgment on Slevira's Eighth Amendment claim. However, a mistaken label for the claim is not dispositive of the ultimate issue of whether Officers used excessive force in their arrest of Slevira. The following analysis considers Slevira's excessive force claims under the Fourth Amendment.

## 2. Qualified Immunity and Excessive Force

The Officer Defendants contend that they did not use excessive force and, in any event, are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "'Qualified immunity gives government officials breathing room to make reasonable but mistaken

judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 572 U.S. 3, 6 (2013) (citations omitted).

To determine if an official is entitled to qualified immunity, a court considers two factors: (1) whether the facts as alleged state a violation of a constitutional right, and (2) whether the right is clearly established, such that a reasonable official would have known that his or her conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (*receded from* by *Pearson v. Callahan*.) A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In this case, the question of whether excessive force was used is dispositive, and, thus, will be considered first.

Slevira had a constitutional right not to suffer excessive force during his arrest. Whether excessive force was used during the course of an arrest is evaluated under the Fourth Amendment; force is unconstitutionally excessive if it is "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene,

6

including what the officer knew at the time, not with the 20/20 vision of

hindsight." *Id.* (citing *Graham*, 490 U.S. at 396).

> The following considerations bear on the reasonableness of the force used:

> "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. The most important factor is whether the suspect posed an immediate threat. This analysis is not static, and the reasonableness of force may change as the circumstances evolve.

*Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022) (internal citations and

quotations omitted). "[W]e examine the totality of the circumstances and consider

whatever specific factors may be appropriate in a particular case…" *Bryan v.

MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations and citations

omitted). "Although [an] attempt to craft an easy-to-apply legal test in the Fourth

Amendment context is admirable, in the end we must still slosh our way through

the factbound morass of "reasonableness."" *Scott v. Harris*, 550 U.S. 372, 383

(2007). (The Officer Defendants' brief uses the test as described in *Graham v.

Connor*, 490 U.S. 386 (1989), which is the controlling Supreme Court authority on

the issue. The test in *Hyde* cites and relies on *Graham*, but is more useful in this

context because of the greater particularity of the analysis.)

To determine whether the Officer Defendants' actions were objectively

reasonable, the Court must first ascertain the relevant facts. As pointed out above,

the parties disagree about several facts, specifically regarding the degree of threat posed by the defendant and whether he was resisting arrest. "When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and citations omitted).

However, facts must only be viewed in the light most favorable to the non-movant if there is a "genuine" dispute. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

One difficulty in assessing the disputed facts in this case arises because Slevira did not comply with the requirements of L.R. 56.1(b). L.R. 56.1(b) requires a Statement of Disputed Facts that directly responds to each of Defendants' facts

8

and cites specific support in the record to show the dispute. Slevira's Statements of Disputed Facts are more in the form of questions: "whether the plaintiff refused to follow and obey commands," "whether the plaintiff offered any resistance of disobedient to defendants before they assaulted him," "whether the force utilized by the defendants against the plaintiff was applied in good faith effort," etc. (Docs. 40 and 42.) These are not facts supported by the record that dispute Defendants' facts; they are merely restatements of the questions at issue. Slevira also does not identify any source for his factual assertions other than his own recollections.

Slevira did submit two Declarations in support of his response briefs, in which he lays out the facts as he sees them. (Docs. 39-1 and 41-1.) The documents attached to one of his declarations include many of the same officer reports submitted by the Defendants, as well as some medical records, the Billings Police Department's use of force policy, and a search warrant and its return. The Court will, to the extent feasible, interpret these declarations and their attachments as the basis of his disputed facts, despite Slevira's failure to comply with L.R. 56.1(b), while recognizing that "a district court has no independent duty to scour the record in search of a genuine issue of triable fact…" *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

The *Hyde* factors identified above provide the framework for the Court's determination of the relevant facts. *Hyde*, at 870. The first part of the Court's

analysis must focus on Slevira's behavior, which is the point of greatest difference

between the parties' recollections, and which undergirds three of the relevant *Hyde*

factors: the severity of the security problem at issue; the threat reasonably

perceived by the officer; and whether the plaintiff was actively resisting. *Id*.

Slevira does not contest the fact that, prior to his arrest, officers were aware

that he was suspected of killing one person already that evening, and that he had

entered the house without permission and shot another victim inside. (Doc. 31

(Defendant Officers' SUF) at ¶¶ 4 – 9 (supported by the incident reports of various

officers).) In fact, Slevira's account of the evening begins as he had already been in

the basement for several hours. (Doc. 41-1 at 1 – 2.) Thus, there is no reason to

question the context in which Defendant Officers encountered Slevira, as a man

who had likely killed someone in order to steal a vehicle and shot another man in a

private residence. Slevira also does not dispute that when officers arrived at the

residence, they heard gunshots coming from the house, and that Slevira was

shooting at them from the basement. (Doc. 31 at ¶ 10 and 31-3, 31-5, and 31-7.)

Slevira also does not dispute that officers were told by the homeowner that there

was an unsecured pistol in a drawer in the basement, as well as "multiple AR 15

style rifles and shot guns" in a safe "that could be broken into." (Doc. 36-2 at 1.)

Officers were able to see a pistol on the floor of the basement near the stairway

landing. (Doc. 36-2 at 2.) That context and background is undisputed by Slevira

and relevant to the Officers' ensuing actions. The *Hyde* factors of the severity of the security problem at issue and the threat reasonably perceived by the officers weighs heavily in favor of the Defendants. The officers were aware that they were engaging with an extremely violent person who was willing to shoot at them or others, and unwilling to leave the basement.

Slevira does address the factor of whether he was actively resisting, asserting that he was not. Slevira claims that he was sleeping in the basement, and "once [he] was made aware of the situation, [meaning the introduction of gas to the basement, he] immediately followed all commands made by officers." (Doc. 41-1 at 2.) His description of his conduct is that he immediately began following orders, walked up the stairs with his hands up, as directed, and, feeling wobbly, "tried multiple times to vocally let officers know." (Doc. 41 at 2.) These assertions in his response brief to the Officer Defendants are supported only by his declaration and contradict the reports of the officers.

However, in support of this verbatim assertion made in his response to the City of Billings brief, Slevira cites and attaches a portion of the incident report of an Officer Milam. (Doc. 39-2 at 15.) The report claims that Slevira did not respond to any of the officers' commands, which led Officer Milam to be concerned about what Slevira was planning. It also describes how the officers used flashbangs to "cause disruption" for Slevira, and how they broke out windows to put a robot in to

monitor him. The only movement they observed in the basement was a door closing.

Why Slevira cites this report in support of his claim to have responded to Officers' commands is unclear, because Slevira's copy of the report underlines Milam's statements about how Slevira responded once he was out of the basement, apparently in order to establish that he followed the officers' commands. In that report, though Slevira was "seemingly compliant" in the basement and began to walk up the stairs with his arms up, by the time he got to the top he yelled at the officers. (Doc. 39-2 at 15.) When he was grabbed by the arrest team, "he immediately went on the fight." The report describes Slevira's attempt to escape from the officers, causing Milam to fear that Slevira had a hidden weapon that he was going to pull on the officers. *Id.* Though this report was submitted by Slevira in support of his response brief, it further corroborates the reports filed by Defendants that uniformly describe Slevira's efforts to resist being cuffed and arrested.

Slevira characterizes his actions as merely an attempt to defend himself against the officers' assault. He claims he "did not resist or threaten the officers in any fashion, nor was I in possession or branish [sic] any type of weapon. I also followed every command." (Doc. 41-1 at 4.) Once on the ground, Slevira "laid there and tried to protect [him]self from the defendants' blows, kicks, muzzle

12

strikes and more, which ultimately caused [him] to roll from side to side." *Id.* This is the crux of the parties' factual dispute, and Slevira contends this dispute precludes summary judgment. (Doc. 41-1 at 4.)

The record does include a video of the events, provided and relied upon by Defendants. (Doc. 31-8.) The Court may use the video to assist in its determination of what a reasonable jury could conclude. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Neither party alleges that the video is doctored or altered, allowing the Court to rely on it to resolve some of the disputes between the parties. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

 The video submitted by Defendants is from the body camera of Defendant Romero. (Doc. 32 at 2.) It is 45 minutes long. The video begins in the dark, in the garage, where the officers were staged throughout this episode. The video perspective is from Romero's chest; his firearm is visible, held in front of him. The stairs to the basement are in front of him and well-illuminated. The timestamp at the beginning reads approximately 00:28 on January 9, 2023; if that is accurate, at the beginning of the tape, Slevira and the officers have been at the house for approximately six hours. (Doc. 31 at 2.) The officers can be heard discussing their plan to put gas into the basement, and anticipating how to handle Slevira when he comes up the stairs. The officers are wearing some sort of breathing apparatus. The first 24 minutes of the video are passed in idle discussion, adjusting gear, dealing

with equipment malfunctions, and otherwise waiting. An officer, presumably Defendant Wallis, is visible in front of Romero, right at the top of the stairs, with his firearm pointing in the direction of the stairs. Nothing is heard from Slevira during this time.

At 00:51:14 on the timestamp, the officers are notified that "gas is in." At 00:52:25, the officers say they hear coughing, and shortly after, someone says Slevira is coming out. (The officers had placed a "throwbot," which allowed them a limited view of the basement.) For the first time on the video, Slevira's voice can be heard. An officer yells at him to come to the sound of his voice. Another officer says Slevira is on the ground with open hands. The officer at the top of the stairs continues yelling "walk to the sound of my voice," and "keep your hands visible." Another officer who has a camera view says Slevira is still lying on the floor. Coughing can be heard. For almost two minutes, Slevira lies on the floor while the officer is yelling at him to get up and come up the stairs. Just as the officers are discussing how to handle his refusal to stand up, he gets up and starts to move up the stairs. The officer at the top of the stairs tells him to turn around and then repeatedly tells him to keep coming. At 00:54:58, Slevira arrives at the top of the stairs and is swept to the floor.

At this point, Romero moves toward where Hilde and Wallis are wrestling with Slevira. Exactly what is happening is hard to discern, though at least one

14

officer continues to yell at Slevira to give up his hands. Romero still has the shotgun with beanbags in his hands. An officer yells at Romero, "Jayden, you're going to have to hit him with that thing." Romero appears to strike him three times with quick jabs with the muzzle of the shot gun. The officers and Slevira continue to struggle, with the officers telling Slevira to quit resisting, and Slevira eventually yelling "ow!" By 00:55:54, one minute later, he is subdued. When either Hilde or Wallis struck him in the face, as described in their incident reports, is not apparent in the video.

The rest of the video shows the officers checking Slevira for weapons, lifting him up, walking him out to a patrol car, searching him again while he leans against the car, and then putting him in the car. He appears to be in some pain, as evinced by grunts, but he is not coughing or otherwise complaining. He is in the car by 00:58:35.

The last ten minutes of the video show the officers proceeding through the house to clear and secure it. The video shows nothing relevant to Slevira's arrest, other than showing that the levels of gas in the basement were still high enough to be uncomfortable for a person without a breathing apparatus.

Based on the record, in assessing the *Hyde* factors of the severity of the security problem at issue, the threat reasonably perceived by the officers, and whether the plaintiff was actively resisting, the Court concludes that the

Defendants officers were justified in the use of force. *Id*. *Hyde* identifies whether the suspect posed an immediate threat as the most important factor, and the Court concludes that the officers reasonably thought he did, based on his actions earlier that evening, his reluctance or refusal to timely respond to commands, and his ultimate physical resistance to being cuffed.

The Court turns, then, to another of the *Hyde* factors, the amount of force used, to see if, given the reasonable perception of threat, the officers acted appropriately. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This analysis includes considering any effort made by the officer to temper or to limit the amount of force. After Hilde's initial strikes, which did not stop Slevira from resisting, Hilde told Romero to use his shotgun. Romero states that he determined he was too close to fire it safely, so he chose to strike Slevira with it. (Doc. 31-1 at 2.) At some point, someone requests a taser, but that level of force is never reached. Thus, the Officer Defendants chose to remain at a low level of force using strikes, during what ended up being around a one-minute struggle. The level of force was appropriate and not escalated further than necessary. After Slevira's earlier violence and a prolonged period of no communication with him, the Officers were entitled to expect the possibility of violence. They were reasonable

to take him to the ground for cuffing, and when he actively resisted being cuffed, they were justified in using moderate force to subdue him. Given Slevira's resistance, it may in fact have been the moderate use of force that caused him to comply with being cuffed.

Finally, *Hyde* considers the extent of the plaintiff's injury. The only evidence in the record regarding his injuries, and thus undisputed, is presented by Slevira. (Doc. 39-2 at 5 – 6 and 9 – 10.) Those records show that Slevira was not cooperative with the EMTs who picked him up at the site of his arrest. (Doc. 39-2 at 5.) He complained of globalized pain and had bruising and abrasions to his chest, back, and right arm, with some circular bruising that the EMT thought might possibly be the result of less than lethal munition. *Id*. He also had a hematoma over his right eye. To the extent the EMTs could determine, given Slevira's lack of cooperation, Slevira had no other injuries. Slevira complained of not being able to breathe during transport, which likely relates to his later diagnosis of pneumothorax. EMTs noted the police's use of gas. *Id.*

The emergency room records reflect a similar story. Slevira was "verbally aggressive" with the medical staff. (Doc. 39-2 at 9.) A CT scan showed a right rib fracture and related tension pneumothorax, which was relieved with a chest tube. At 1:45 a.m., the ER physician signed his note, with the final impression of multiple abrasions with contusion, pneumothorax, and rib fracture. (Doc. 39-2 at

17

9.) Slevira was subsequently admitted to the hospital. The notes related to his admission, entered at 4:36 a.m., do not identify any additional injuries.

Slevira's injuries do not change the calculus of the reasonableness of the use of force as described above. The bruising and abrasions are not noteworthy, and could be a result of his thrashing on the ground or his car crash. The hematoma above his eye is likely a result of Hilde's or Wallis' strike. The circular bruises noted by the EMT may be a result of the muzzle strikes, because the record shows that no bean bags were used against Slevira. Slevira's most significant injury is his broken rib and the related pneumothorax, which was addressed within an hour of his arrest. All told, Slevira's injuries were relatively minor and treated immediately.

After considering all of the *Hyde* factors, and relying on the video of the arrest at issue, the Court concludes that there is no genuine dispute as to any material fact and no genuine issue for trial. No reasonable juror could conclude that the force used was excessive in the circumstances. Defendants are entitled to judgment as a matter of law. And because there was no constitutional violation, there is no need to reach the issue of qualified immunity.

### C. City of Billings' Motion

Defendant the City of Billings Police Department ("Billings") filed its own motion for summary judgment. (Doc. 34.) Billings' motion, like the Officers',

18

contends that Slevira cannot state a claim for a violation of his Eighth Amendment rights, because he was not a convicted person. (Doc. 35 at 6.) Billings also posits that Slevira cannot establish either that his constitutional rights were violated, or that any violation was a result of a City of Billings policy, procedure, or custom, as required for *Monell* liability. (Doc. 35 at 8, citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).) As explained above, the Court does not find any constitutional violation by the responding officers, and therefore Slevira's claims fail *ab initio*.

As to the City's liability, under §1983, a municipality can be held liable for constitutional violations that occur pursuant to its policy, custom, or practice. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002)); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A municipality cannot be liable under §1983 on the theory of respondeat superior alone. *Monell*, 436 U.S. at 691.

To establish *Monell* liability on a policy and custom theory, Slevira must show "a direct causal link between a municipal policy or custom and the alleged

19

constitutional deprivation." *Castro v. Cty. of L.A.*, 833 F.3d 1030, 1075 (9th Cir. 2016) (en banc)). A custom, as opposed to a formal policy, must "be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911,918 (9th Cir. 1996).

Slevira has failed to respond to Billings' position regarding *Monell* in his brief, nor has he alleged sufficient facts regarding a policy, custom or practice of the City of Billings. (Docs. 39 and 39-1.) He submitted a copy of Billings' use of force policy to his brief, but he does not explain how this policy shows the City violated his rights. His sole reference to the policy is a statement that these policies "never stated that the amount of force used to make an arrest was justifiable." (Doc. 39-1 at 4.) It is not clear whether this statement means the use of force with him violated the policy, or was in accordance with it. Slevira does not allege that any alleged violation of his rights was the result of a Billings policy.

Slevira does assert that Officer Wallis has a history of excessive force complaints. (Doc. 39-1.) He has submitted some disciplinary documents in support of that claim. (Doc. 39-2 at 59 – 68.) But Wallis' history, especially when it shows that he has been disciplined for his prior conduct, does not show that Billings has a policy of using excessive force. If anything, it shows that Billings disciplined its officer when the force used had been determined to be excessive. The previous bad

acts of one officer does not, without more, amount to a custom or practice of the City of Billings. Slevira has failed to show Billings is subject to *Monell* liability for his arrest.

### III.    CONCLUSION

Plaintiff Slevira has failed to demonstrate that there is a genuine issue of material fact that prevents summary judgment. Defendants are entitled to judgment as a matter of law.

Accordingly, it is HEREBY ORDERED:

1.  Defendants' motions for summary judgment are **GRANTED**. (Docs. 29 and 34.) The Clerk of Court is directed to close this matter and enter judgment for Defendants, pursuant to Fed. R. Civ. P. 58.

2.  The Clerk of Court is directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

DATED this 21st day of July, 2025.

Dana L. Christensen, District Judge
United States District Court